FILED _____ / _____ ENTERED
_____ LODGED _____ RECEIVED

**JUN 0 5 2002**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KATURIA S. SMITH, ANGELA ROCK and
MICHAEL PYLE,

                    Plaintiffs,

v.

THE UNIVERSITY OF WASHINGTON
LAW SCHOOL, WALLACE D. LOH,
ROLAND HJORTH, SANDRA MADRID,
and RICHARD KUMMERT,

                    Defendants.

No. C97-335Z

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

I.

Introduction

This matter came on for a bench trial on April 8, 2002 as to issues of liability.

Plaintiffs were represented by Michael Rosman, Steven Hemmet and Hans Bader of the

Center for Individual Rights and defendants were represented by Michael Madden and Bruce

Megard of Bennett Bigelow & Leedom, P.S.  At the conclusion of the trial the Court took the

case under advisement.  The Court has reviewed the testimony of the witnesses at trial,

exhibits admitted during trial and the designated deposition testimony of Richard Kummert

Vols. I, II and III (253-294), Sandra Madrid (90-134), Joseph Sully and Nat Hentoff.  The

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  1

1   Court has also considered the Supplemental Stipulated Facts, filed May 21, 2002, docket no.
2   329.

3       Plaintiffs Katuria Smith, Angela Rock and Michael Pyle were unsuccessful applicants
4   to the University of Washington Law School (the "Law School") in 1994, 1995 and 1996,
5   respectively.  During these years, it is undisputed that the Law School considered race as one
6   of several diversity factors in making its admissions decisions.  Plaintiffs bring claims for
7   damages against the Law School under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §
8   2000d, which prohibits any program or activity receiving federal financial assistance from
9   discriminating on the basis of race, color or national origin.  Plaintiffs challenge the
10  admissions system used by the Law School during the years in question.  Plaintiffs contend
11  race was improperly considered as a factor in the admissions process.  Plaintiffs further
12  contend that even if race could be considered as a factor in the admissions process,
13  defendants did not narrowly tailor the Law School's admissions program to meet a
14  compelling government interest, in violation of federal law.  Plaintiffs contend that, but for
15  the use of race as a factor in the admissions program, each of the Plaintiffs would have been
16  admitted to the Law School.  Plaintiffs also claim damages under 42 U.S.C. § 1981 and 1983
17  against individual defendants who were involved in establishing and carrying out the Law
18  School's admissions program during the relevant time periods.

20      Defendants contend that Plaintiffs are not entitled to any relief because the Law
21  School's policies and practices were consistent with a "Harvard-type" admissions policy,
22  upheld in Regents of the University of California v. Bakke, 438 U.S. 265 (1978).  Defendants
23  contend the program was narrowly tailored to meet the Law School's objectives of
24  educational diversity, which is "believed to be relevant to a rich and effective study of the
25  law."  Defendants also contend that race was not a factor in the denial of each of the
26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  2

1  plaintiffs' application to the Law School and none of them would have been admitted even if
2  race had not been considered in the admissions process.

3      This Court has previously held that educational diversity is a compelling government
4  interest that meets the demands of strict scrutiny under <u>Bakke</u>. <u>See</u> <u>Smith v. University of</u>
5  <u>Washington Law School</u>, 2 F.Supp. 1324 (1998), aff'd, 233 F.3d 1188 (9th Cir. 2000). Thus,
6  the Fourteenth Amendment permitted the Law School to consider race in connection with its
7  admissions program prior to the passage of Initiative 200 ("I-200") in the State of
8  Washington in 1998. With the passage of I-200, Washington now prohibits the granting of
9  "preferential treatment" to any individual "on the basis of race." RCW 49.60.400.
10     The focus of the trial was to determine whether the Law School's program was
11  narrowly tailored to meet the requirements of <u>Bakke</u> for the years in question.
12     Based on the following Findings of Fact, the Court concludes that the Law School's
13  admissions program was consistent with <u>Bakke</u> and judgment should be entered in favor of
14  defendants on all claims.
15

                                    II.
16
                             <u>Findings of Fact</u>
17

18 A.    <u>Plaintiffs</u>

19     1.    Plaintiffs Katuria Smith, Angela Rock, and Michael Pyle are white residents of
20  the State of Washington who submitted complete applications to the Law School in 1994,
21  1995, and 1996 respectively, prior to the deadlines for applying. Plaintiffs' exhibits 86, 87,
22  and 88 are the Law School's application files for, respectively, Katuria Smith, Angela Rock,
23  and Michael Pyle. Each of the plaintiffs' applications for admission in these years was
24  rejected. Smith attended Seattle University School of Law and graduated in May 1997.
25  Rock attended Georgetown University Law Center and graduated in May 1998. Pyle re-
26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  3

1  applied to the Law School in 1999 and was admitted, but chose not to attend.  He has no
2  current plans to attend law school.

3      2.      The University of Washington Law School admissions form asked each
4  applicant to disclose his or her race.  Each of the plaintiffs identified his or her race by
5  checking the box next to "white."

6  B.    Defendants

7      3.      Defendant University of Washington Law School is a state-operated institution
8  which operates as part of the University of Washington.

9      4.      At all times material the Law School received federal funds.

10     5.      Each of the individual defendants was an employee of the Law School during
11 the time in question and acted under color of state law for purposes of 42 U.S.C. § 1983.

12     6.      Defendants Sandra Madrid and Richard Kummert were the individuals
13 primarily responsible for administering the admissions procedures adopted by the Law
14 School.  Defendant Madrid was, at all times relevant to this litigation, Assistant Dean and the
15 liaison to the admissions committee.  Defendant Kummert is a professor at the Law School.
16 He has been actively involved in the admissions process since 1965.  During 1994 to 1998,
17 he was the chair of the admissions committee.
18

19     7.      Defendant Wallace Loh served as Dean of the Law School during the period in
20 which plaintiffs Smith's and Rock's applications were under consideration.  Defendant
21 Roland Hjorth served as Dean of the Law School during the period in which plaintiff Pyle's
22 application was under consideration.  Loh was Dean of the Law School until mid-July 1995.
23 Hjorth became Dean in mid-August 1995.

24     8.      The Dean appoints the members of the admissions committee each year.
25
26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  4

C.      History of the Law School's Admissions Policies

9.      Prior to the late 1950's, the Law School's admissions system was non-selective. All applicants meeting minimum qualifications were admitted. The open admissions policy applied to applicants of all races. Stipulated Facts, docket no. 318 at ¶ 11 (hereinafter "Stip. Facts").

10.     In 1968, the Law School commenced a special program to consider applicants who were members of certain preferred races or ethnicities. The Law School referred to those admitted under this program as "special admissions." Some minorities were admitted with academic credentials that would have led to the rejection of those who were not members of a preferred race or ethnicity. Stip. Facts ¶ 13.

11.     The stated rationale of the special admissions program was that

Certain ethnic groups in our society have historically been limited in their access to the legal profession and . . . the resulting underrepresentation can affect the quality of legal services available to members of such groups, as well as limit their opportunity for full participation in the governance of our communities . . .

Exhibit 20, p. 14;  See also Exhibit 21, p. 5.

12.     The Law School's admissions policies for the period 1977 to 1989 are described in Exhibits 21-26. During this period of time, the Law School published a policy on admissions (the "Policy") stating that the Law School "gives special consideration to applicants who are members of racial and ethnic minority groups that have been subject to long-continued, pervasive discrimination sanctioned by the legal system and that would not otherwise be meaningfully represented in the entering class." The Policy identified examples of such groups as follows: "Asian Americans, Black Americans, Chicanos, Filipino Americans, Native Americans/Indians, and Puerto Rican Americans." The Policy in effect between 1977 and 1989 stated that membership in those groups would be considered a positive factor so as to enhance the "diversity" of the student body. The Policy did not

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  5

1  identify any other criteria that would enhance the "diversity" of the student body.  Exhibits

2  21-26.

3      13.    In 1989, the Law School reviewed its admissions policy because several

4  constitutional scholars at the Law School had raised questions "regarding language in the

5  [P]olicy or aspects of its administration."  Stip. Facts ¶ 17.

6      14.    Prior to 1989, Section 1 of the Policy stated that the Law School sought those

7  individuals who "will contribute to the diversity of the student body and of the legally trained

8  segment of the population."  In the memos written by the admissions committee to the faculty

9  in 1989 recommending changes in the Policy, the admissions committee recommended that

10  Section 1 of the Policy be amended to strike the words "and of the legally trained segment of

11  the population."  The memos stated that "[t]his is a problematic goal under <u>Bakke</u>.  As a state

12  institution, we are not permitted to try to give a racial group a specified portion of the

13  entering class, even if this is intended to overcome deficits of that group in the professional

14  population."  Stip. Facts ¶ 18; Exhibit A-7.

15      15.    In 1989, the Law School faculty voted to change its admissions Policy to

16  conform to <u>Bakke</u> by implementing a "Harvard-type" program (The "Amended Policy").  At

17  the same time, the faculty also voted to eliminate any reference to "the legally trained

18  segment of the population."

19      16.    Despite the intent of the Law School to modify its admissions policy, Section 1

20  of the Amended Policy printed in the Law School's Admissions Bulletin for every year

21  between 1990 and 1998, continued to state that the Law School's policy is designed to

22  promote diversity of <u>both</u> the student body <u>and</u> the legally trained segment of the population.

23  Stip. Facts ¶ 20; Exhibit 1; Exhibit 45, p. 9.  This language remained in the Law School

24  admissions bulletins as a result of oversight by defendants.

25      17.    During the years in dispute in this litigation, 1994-1996, although the Law

26  School's admissions bulletin referred to promoting diversity in the "legally trained segment

FINDINGS OF FACT AND
CONCLUSIONS OF LAW 6

1  of the population," this goal was never considered in the admissions process as a goal for

2  admissions to the Law School.

3      18.    In 1989, the Law School faculty also recommended a number of other changes

4  in the Policy, including changes to Section 2, the "academic potential" section, and Section 3,

5  the stated "diversity" section. These recommended changes have appeared in the Admissions

6  Bulletins subsequent to 1989. Stip. Facts ¶ 20; Exhibits 1, 45, p. 9.

7      19.    Beginning in the fall of 1989, Section 2 of the Amended Policy stated that "[i]n

8  measuring academic potential, the Law School relies primarily on the applicant's

9  undergraduate grade point average and performance on the Law School Aptitude Test. . . .

10  For most applicants, the ranking that results is the most nearly accurate measure of relative

11  academic potential." Section 2 also stated that the Law School considers other factors

12  "where numerical indicators do not appear to be an adequate measure of academic potential,"

13  and further stated that those other factors include the strength of the candidate's

14  undergraduate institution and course of study, the attainment of advanced degrees, post-

15  college experience, recommendations, variation in grades over time, and past social or

16  economic disadvantage, or changes in health, that might have affected academic

17  performance. Stip. Facts ¶ 20; Exhibits 1, 45, p. 9. Among the "post-college experiences"

18  that the Law School valued as a diversity factor was work experience in an activity

19  suggesting strong analytical ability.

20      20.    Beginning in the fall of 1989, Section 3 of the Amended Policy stated that

21  "racial or ethnic origin" was a "diversity" factor that the Law School would consider in

22  making admissions decisions. Stip. Facts ¶ 21. The Law School has considered race as a

23  factor in admissions since 1989. Pretrial Order, Admitted Facts, ¶ 5. At all times material,

24  Section 3 of the Amended Policy provided in its entirety as follows:

25          § 3. In selecting the entering class, the Law School does not make all of its
           admission decisions solely on the basis of predicted academic performance.
26          Important academic objectives are furthered by classes comprised of students having

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  7

talents and skills derived from diverse backgrounds believed to be relevant to rich and effective study of law. Factors that indicate this diversity include, but are not limited to, racial or ethnic origin, cultural background, activities or accomplishments, career goals, living experiences, such as growing up in a disadvantaged or unusual environment or with a physical disability, or special talents. This list is not exhaustive, and the factors are not of equal weight; moreover, no single factor is dispositive. Furthermore, no factor will confer admission on an academically unqualified applicant.

Applicants are invited to describe these and other aspects of their background that would benefit the diversity of the law school community.

Exhibit A-8.

21.     After the adoption of the Amended Policy in 1989, the persons involved in the admissions process met and discussed the changes and how the program should be applied to be consistent with Bakke. At all times material, the Law School has considered diversity factors such as "race or ethnic origin, cultured background, activities or accomplishments, career goals, living experiences, such as growing up in a disadvantaged or unusual environment or with a physical disability, or special interests that you believe would contribute to the diversity of the law school community." Application for Admission at Form A ¶ D, Exhibit 45. The Law School concluded that diversity in the classroom is an essential part of a quality legal education, because a broad pool of law students from diverse backgrounds dramatically improves the quality of the educational experience for all law students. The Law School also concluded that racial diversity is an important form of diversity because race has a significant impact on the experiences of people, and the effect of race is particularly important with respect to views and experiences of people of color related to issues of law. Consistent with its purpose of enhancing educational diversity, a significant purpose of the Amended Policy was to decrease emphasis on numeric indicators of qualification to attend law school, i.e., undergraduate grade point average ("GPA") and Law School Aptitude Test ("LSAT") scores, and to increase emphasis on diversity factors and non-numeric indicators of merit.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  8

22.     As part of adopting its Amended Policy, the Law School took steps to review admission procedures to avoid overly weighing any diversity factors.  The purpose of the review was to arrive at a "common understanding" as to what was considered within and without the protected area.  Dean Madrid met with Law School Professors Jay and Kummert informally to discuss the new Amended Policy.  Madrid was told and understood that under Bakke race could be considered as a diversity factor but could not be a determining factor.

23.     The proportion of non-whites in the Law School student body had been between 7% and 18% throughout the late 1980's.  That proportion increased dramatically beginning in 1990, the first class to be admitted under the Amended Policy.  Stip. Facts ¶ 23.

24.     But for two unusual years in which the Law School had an unusually high "yield" from admissions offers to non-white applicants, enrollment of students of color from 1990 to 1998 stayed at about 35% of the entering classes.

25.     In April 1994, the Law School faculty voted to raise the number of students in a class from 150 to 165.  At the same time, they set a target of from 70-75% for the proportion of a matriculated class that would have the State of Washington as their residence.  Stip. Facts ¶ 24.  Residency is considered a "plus" in the admissions process.

26.     The Law School is a member of the Association of American Law Schools ("AALS").  Defendant Loh served on the Executive Committee of the AALS from 1992 through 1997.  He served as president-elect of the AALS in 1995, president in 1996, and past president in 1997.  Stip. Facts ¶ 26.

27.     A member law school must fulfill the obligations of membership reflected in the by-laws of the AALS.  Exhibit 106, By-Laws § 2-2.  One of those obligations is set forth in Section 6-4(c) of the By-Laws, which states that "[a] member school shall seek to have a faculty, staff and student body which are diverse with respect to race, color and sex."  Id. (emphasis added).

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  9

28.     In February 1996, an inspection of the Law School was conducted by a team from the AALS and the American Bar Association ("ABA") for purposes of AALS membership compliance and ABA reaccreditation.  In preparation for that inspection, the Law School created two sets of documents: a self-study and answers to a site-evaluation questionnaire.  The site-evaluation questionnaire required responses to a series of questions; the self-study was an evaluative document that was written after a series of faculty colloquia.  Stip. Facts ¶ 27.

29.     Exhibits 18 and 48 were part of the Law School's self-study addressing the areas of "Admissions" and "Programs For Promoting Opportunities For Racial And Ethnic Minorities"; Exhibits 19 and 49 were part of the Law School's answers to the site-evaluation questionnaire covering those same topics.  These documents describe how the Law School attempted to increase minority enrollment.  Stip. Facts ¶ 28.

30.     Exhibit 49, entitled "Programs For Promoting Opportunities for Racial And Ethnic Minorities," stated in part that the Law School "maintains one of the most progressive and outstanding minority admissions programs in the nation."  Exhibit 49, SEQ XV-1.  The Law School also extolled the "increase of over 100% in the amount of minority students admitted and enrolling at the Law School" since the last accreditation process.  Exhibit 49, SEQ XV-1; id. at SEQ XV-9 ("commendable results").

31.     The Law School attempted to increase minority enrollment through methods other than admission preferences.  The Law School sought to recruit qualified minorities through a variety of pre- and post-application programs.

D.     The "Ethnicity Substantiation Letter"

32.     At all times material "race or ethnic origin" was a positive factor under the Law School's admissions policy.  The admission application contained the question, "What race do you consider yourself to be in?"  Application for Admission Form A, Exhibit 45.  The form asked applicants to answer regardless of the person's citizenship status.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  10

1    33.    The Law School sometimes sent a form "ethnicity substantiation" letter to
2    applicants who marked the "racial or ethnic origin box" on the front of the application.  The
3    letter stated that the information provided in the application was insufficient and asked the
4    applicant to provide additional information on "family background" and "cultural activities
5    and associations."  See Letter, Exhibit 35.

6    34.    This was the only letter the Law School used to seek additional information
7    about an applicant's diversity.

8    35.    The Law School did not ask any applicant for any additional information
9    concerning their background unless the applicant had indicated that he or she was a member
10   of a minority race.

11   36.    Each of the plaintiffs in this case indicated in their application that they were a
12   member of the white race; none of the plaintiffs received the form ethnicity substantiation
13   letter in connection with their applications for admission to the Law School.  None of the
14   plaintiffs received any other request from the Law School for additional information
15   concerning their background so the Law School could better assess their diversity.  Stip. Fact
16   ¶ 35.

17   37.    Plaintiff Smith contends that if she had been asked for more information on
18   race, she would have disclosed that she was very poor, that neither her mother nor 2 sisters
19   had graduated from high school, and that she had just discovered she was 1/8 Cherokee.
20   Plaintiffs Rock and Pyle do not contend they should have been asked for additional
21   information or that they had any additional information to provide concerning their race or
22   ethnic background.

23   38.    The Law School application filled out by each of the plaintiffs required a
24   personal statement.  The application explained that this statement was important for the
25   following reasons:

26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  11

> Important academic objectives are furthered by classes comprised of students having talents and skills derived from diverse backgrounds. Identify in your own words factors such as racial or ethnic origin, cultural background, activities or accomplishments, career goals, living experiences, such as growing up in a disadvantaged or unusual environment or with a physical disability, or special talents that you believe would contribute to the diversity of the law school community. Please include a separate sheet and limit your response to 700 words.

Exhibit 45.

39.     In plaintiff Smith's personal statement, attached to her application, she did not disclose additional information about her race or ethnic background or how she thought she would contribute to the diversity of the law school community. See Smith Personal Statement, Exhibit 86 at 990701.

E.     The Application Process - In General - Years 1994-1996

40.     The applications deadline to the Law School for the years 1994-1996 was January 15.

41.     All applicants with valid LSAT scores and an undergraduate GPA were assigned an index score by the Law School Admission Council ("LSAC"). The index score was a composite of a student's undergraduate GPA and LSAT score. If the student had two LSAT test scores in the previous three years, an average of the two was used by the LSAC in calculating the index. On those occasions where the LSAC did not average such scores, for whatever reason, the Law School considered both scores in evaluating the applicant. In both 1994 and 1995, the index was a three-digit number on the scale of 140-213. In those years, the formula for creating the index gave approximately 62% weight to the LSAT and 38% weight to the undergraduate GPA. That formula was $10.7100 \times GPA + .9520 \times LSAT$. Stip. Facts ¶ 37.

42.     During the years in question, the Law School received about 2000 applications per year for approximately 165 positions per year. Approximately 250-300 candidates with the highest index scores comprised a "presumptive admit" category of applications. Kathy Swinehart, the Law School's Admissions Coordinator, was assigned to read the applications

of the "presumptive admit" candidates. Ms. Swinehart could recommend that applicants from this group be admitted or, alternatively, that they be referred to the admissions committee for further consideration. Her decisions were reviewed by Professor Kummert. She had no authority to recommend denial of a candidate for admission. The cumulative presumptive admit group during the years 1994-1998 was 89% white, 8% Asian, and the remainder made up of various other ethnic minorities. Stip. Facts ¶ 38.

43.     Applications by candidates with index scores below the presumptive admit cut-off were part of a "discretionary" or "presumptive deny" group and handled in the following manner:

(a)     In 1994, white applicants with index scores of 195-96 were referred to the admissions committee without review by the admissions staff. All other files were read by Dean Madrid, who admitted, rejected, or referred them to the admissions committee. Professor Kummert reviewed her decisions.

(b)     In 1995 and 1996, Dean Madrid read all or most files below the presumptive admit cut-off. As before, she admitted, rejected, or referred applications to the admissions committee. Professor Kummert also reviewed Dean Madrid's decisions with respect to these files.

44.     The Law School sought to have approximately 250-300 candidates reviewed by the admissions committee each year. The admissions committee did not begin its work of reviewing files until after Madrid, Swinehart and Kummert had finished their work.

45.     The admissions committee consisted of six professors and three students. The admissions committee was divided into three subcommittees of three persons each; each subcommittee would review 1/3 of the files, divided alphabetically. Dean Madrid did not participate in the work of the admissions committee. Professor Kummert was chair of the admissions committee and participated on one of the subcommittees. Stip. Facts ¶ 41.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  13

1      46.     Each member of a subcommittee would rank the candidates on a scale of 1-5.

2  Each reviewer was asked to distribute the candidates that they reviewed evenly among the

3  five possible scores so that 20% of the candidates reviewed were given each of the five

4  possible scores.  In practice, most reviewers gave less than 20% of the candidates the lowest

5  rank of "1."  If there were rankings by individual members of a subcommittee for a particular

6  applicant that differed by two or more points, the subcommittee was instructed to consult one

7  another and reconsider their individual rankings for that applicant.  The sum of the individual

8  [sub]committee members' rankings represented a candidate's final "committee rank."  See

9  Stip. Facts ¶ 42.  Exhibit 33 is the ranking sheets for 1995.

10      47     At the end of March, the Law School would admit a certain number of

11  applicants, based on committee rank.  On occasion, offers would be made only to

12  Washington residents among those candidates with a certain committee rank.  Stip. Facts

13  ¶ 43.

14      48.     Those with rankings just below the individuals offered admission based on

15  committee rank were offered a position on a wait list.  Those given a wait list position had to

16  respond positively to remain on the wait list.  Depending on the year, and the yield that the

17  Law School obtained from earlier offers of admission, the Law School would make

18  additional offers of admission from the wait list during the spring and summer.  Stip. Facts ¶

19  44.

20      49.     Applicants who had received offers were required to accept those offers, and

21  place a deposit with the Law School, before June 1 in order to reserve a place in the

22  incoming class.  If the class had not filled by June 1, additional offers would be made from

23  the wait list, based on committee rank and sometimes residency, over the summer months.

24  Stip. Facts ¶ 45.

25

26

50.    Candidates who had been denied an offer of admission could appeal that decision.  Plaintiffs did not appeal their denial of admission to the Law School.  Stip. Facts ¶ 46.

51.    During the years 1994-98, the admission rates for white and non-white applicants were as follow:

Filipino            34.59%

Native American     28.80%

African American    29.60%

White               22.76%

Hispanic            30.24%

Asian               23.88%

Stip. Facts ¶ 47.

52.    The Law School did not establish any racial "quotas," "targets" or "goals" for admission or enrollment.

53.    The Law School did not establish any differential score cut-offs based on race. White and minority candidates were considered and admitted within the same levels of index scores.  The Law School did not exclude white applicants from consideration at any index score level where minority candidates were considered, and admitted whites at or below every index score level where minorities were admitted.  See Exhibit A-1 - all cases.  In the group of applicants with index scores below the median for the entire group, more whites were admitted than any other group.

54.    Defendants did not keep track of the numbers of applicants admitted directly or referred to the admissions committee in any year in question.  However, overall the parties have stipulated that the Law School referred to the admissions committee 282 applicants in 1994, 328 applicants in 1995, and 313 applicants in 1996.  Supplemental Stipulated Facts, docket no. 329.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  15

F.       The Law School's Admissions Process in 1994 - Plaintiff Smith's Application

55.      Plaintiff Smith applied for admission to the Law School in 1994. Smith's admissions file is Exhibit 86. Smith had an index score of 192. In 1994, applicants with index scores below 194 were considered "presumptive deny" candidates. Stip. Fact ¶ 48. There were 94 applicants with an index score of 192, 18 of whom were admitted in 1994. Exhibit 32. Smith was denied admission to the Law School on or about March 9, 1994. Exhibit 86.

56.      Smith's application presents a well qualified applicant for Law School admission. However, the Law School applicant pool for 1994 was extremely well qualified. The Law School experienced an increase in both the number of total applicants and the number of admissions in 1994. There was also a substantial increase of well qualified minority applicants in 1994. A total of 2552 applied (the largest number of applicants ever to apply to the Law School), 546 applicants were offered admission, and a class of 187 was ultimately enrolled (of which 17 withdrew). Exhibit 7. There were a total of 664 applicants to the Law School with an index score higher than plaintiff Smith's score of 192 in 1994. Exhibit 32. The mean undergraduate grade point in 1994 for persons admitted to the Law School was 3.5 and the mean LSAT was 162. Professor Kummert testified and the Court finds that the 1994 applicant pool was one of the strongest groups ever to apply to the Law School. See Exhibit A-4 for the profile of Law School applicants for 1994.

57.      In 1994, the Law School admitted students with index scores ranging from 213 to 166. The "presumptive admit" line in 1994 was set at an Index of 197. A total of 276 candidates with scores between 197 and 213 were considered "presumptive admit" candidates and reviewed by Kathy Swinehart and Dean Kummert. Exhibit A-9, p. 5. 265 of these applicants were offered admission directly and 11 (nine whites and two Asians) were referred to the admissions committee. Stip. Fact ¶ 49.

58.     The remaining 2276 applicants for 1994 are referred to as the "discretionary group," or "presumptive denies" and the majority of these files were reviewed by Dean Madrid.  Exhibit A-9 at 8.  292 applicants with scores above Smith's index score of 192 were rejected.  These rejected applicants included 281 white applicants and 11 minority applicants. Exhibit 32.  Of the 292 rejected white applicants with index scores above Smith's, 157 were denied directly by Dean Madrid.  Exhibit A-15 at 10.

59.     There were 1792 applicants with index scores of 192 or lower.  159 applicants with index scores of 192 or lower were admitted.  These included 29 white applicants and 130 racial minorities.  The remaining 1633 applicants with index scores of 192 or below were rejected.  This group included 458 minorities and 1175 white applicants.  Exhibit 32.  The person admitted with the lowest index score was white with a score of 166.  Exhibit 7 at 5.

60.     In 1994 Dean Madrid read 2140 of the 2276 files below the "presumptive admit" level.  Dean Madrid admitted, rejected or referred these applications to the admissions committee.  Professor Kummert reviewed her decisions.  Dean Madrid's "read" of these 2140 files took about 10 weeks of reading files, 5-6 hours per day, seven days a week. Madrid would average approximately 11 minutes reviewing each file.  Madrid read files from the lowest index score upwards.  During this process Madrid admitted 158 persons with three-digit index scores, of which all were minority applicants.  Stip. Fact ¶ 52.  Madrid also admitted 11 applicants with non-standard index scores, four of whom were white.  Id. Madrid testified she would not admit anyone who did not have one or more diversity factors. These included race, unusual life experiences, foreign language skills, geography, post-college work, advanced degrees, disabilities, achievements in athletics, business or the military, public service and other diversity factors.  Madrid testified that she did not keep track of the race of the applicants she selected for admission or referral.  The Court finds that race was never the sole determining factor in Madrid's decision to admit.  Rather, she considered race and all other applicable diversity factors.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  17

1     61.    During trial, witnesses reviewed various application files, including each of the

2 plaintiffs' files and provided post hoc testimony about the strength and weaknesses of these

3 files. The Court finds this testimony to be of little weight. It is possible to justify almost any

4 decision after the fact but this testimony is not helpful in determining whether race was a

5 determining factor in admissions decisions at the time.

6     62.    Both Madrid and Kummert reviewed Smith's application in 1994 but have no

7 recollection of that review.

8     63.    During 1994, a total of 136 white candidates and 22 non-white candidates had

9 an index score of 195 and 196, just below the presumptive admit level. Dean Madrid,

10 without any review, referred all 136 white candidates to the admissions committee. Forty of

11 the 136 white applicants were admitted after ranking by the admissions committee. Stip. Fact

12 ¶ 57. Madrid reviewed the 22 minority candidates with index scores of 195 and 196. Of the

13 22 minority candidates, Madrid admitted 18, referred 3 and denied 1 applicant from this

14 group. Id.

15     64.    Smith objects to the separate treatment of these 136 white candidates. Smith

16 also points to the very high admit level of these minority applicants by Madrid (18 admits out

17 of 22 candidates) as compared to the much lower admit level (40 admits of 136) of

18 candidates sent to the admissions committee. Smith claims this separate treatment is strong

19 evidence of discrimination based on race. Dean Madrid testified and the Court finds that this

20 separate treatment of the 22 minority candidates was for the purpose of making an early

21 decision on minority applicants who were extremely well qualified based solely on their high

22 index scores. Madrid testified the Law School did not want to delay decision on these

23 minority candidates because they might otherwise choose to attend another school. Of the 22

24 minority candidates in this group, although 18 were offered admission, and 3 were referred to

25 the admissions committee, only 1 Asian and 1 Hispanic candidate accepted. Thus, only 2

26 positions were taken. Stip. Fact ¶ 51.

65.     Although the Court finds this separate treatment of the minority applicants with an index score of 195-196 troublesome on its face, the files were read in conjunction with all other lower scoring non-presumptive admit files and thus were not isolated from comparison with non-minority files.  Given their numeric qualifications and the very small number of high scoring minorities in the pool, it was reasonable for defendants to believe that many of these minority candidates would have been ranked in such a manner that they would have received offers of admission had their files been reviewed by the admissions committee.  Their consideration in this manner did not systematically exclude whites from any seats, nor did it effectively insulate minorities from comparison with whites, given defendants' knowledge of the relative qualifications of applicants in this index group.

66.     Additionally, the Court finds that the automatic referral to the admissions committee of the white applicants in this group did not affect their chances of being admitted as compared to similarly situated students reviewed by Madrid.  The percentage of students admitted either directly or by the admissions committee from the group of students with index scores 1 or 2 points below the presumptive admit cut-off in 1995 and 1996 when first reviewed by Madrid was 28%.  In 1994, 29% of these persons were admitted.  Moreover, the referral of the 136 files to the admissions committee did not result in any harm to Smith.  The 2 minority applicants who accepted their offers of admission had a substantially higher index score than Smith and were highly qualified applicants.

67.     In 1994, 142 minority students received "preferential admits" meaning that race was considered a "plus" for purposes of admission.  See Exhibit A-15 at 7.  Smith asserts that if race had not been considered during the admissions process, she would have been admitted to the Law School in place of one of these 142 students.

68.     There were 169 white applicants sent to the admissions committee but denied admission in 1994.  In general, the Court finds that persons referred to the admissions committee for review were more qualified than applicants not referred to the committee.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  19

1   Accordingly, the Court finds that the 142 spaces would have been re-allocated among the 169

2   students remaining in the admissions committee pool and Smith would not have been

3   admitted to the Law School in 1994 under a race neutral policy.

4   G.    The Law School's Admission Process in 1995 - Plaintiff Rock's Application

5         69.    Plaintiff Rock applied for admission to the Law School in 1995. Rock's

6   admission file is Exhibit 87. Rock had an index score of 196. Rock was a "presumptive

7   admit" applicant in 1995 based on her index score.

8         70.    In 1995, Ms. Swinehart continued to review candidates in the presumptive

9   admit group, with oversight by Professor Kummert. The presumptive admit group in 1995

10  consisted of Washington residents with index scores of 196 or higher, and non-residents with

11  index scores of 197 or higher. This group consisted of 252 applicants, identified in the

12  database as follows: 218 whites, 26 Asians, 5 Hispanics, 1 Native American, 1 African

13  American, and 1 Filipino. Stip. Fact ¶ 54.

14        71.    Swinehart referred 26 white candidates (eight of whom were Washington

15  residents, including Angela Rock) in the presumptive admit category in 1995 to the

16  admissions committee. These candidates received committee scores of between 5 and 15.

17  Four of those referred were offered admission (three residents with committee scores

18  between 12-14 and one non-resident with a score of 15). Stip. Fact ¶ 57.

19        72.    Angela Rock received a score of 10 from the admissions committee. Exhibit

20  33. She was offered a spot on the waiting list, which she accepted. She was denied

21  admission in August 1995. Stip. Fact ¶ 58. No person having a score of 10 from the

22  admissions committee was admitted in 1995. Exhibit A-15 at 12.

23        73.    Madrid was assigned to review all candidates below the "presumptive admit"

24  category in 1995 and in subsequent years, with oversight by Professor Kummert. Dean

25  Madrid admitted 152 applicants, including 8 Filipino, 14 Native American, 30 African

26  American, 30 White, 34 Hispanic and 33 Asian candidates. One white and one Asian with

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  20

non-standard or no index scores were also admitted. She referred 302 applicants including 3 Native American, 284 white, 6 Hispanic, and 9 Asian candidates to the admissions committee. Of these 302 candidates referred to the admissions committee, 96 were admitted including 1 Native American, 85 whites, 4 Hispanics, and 6 Asians. The remaining applicants, including 27 Filipino, 35 Native American, 65 African American, 1128 white, 95 Hispanic, and 332 Asian candidates, were denied by Dean Madrid in 1995, without referral to the admissions committee. Stip. Fact ¶ 60.

74.     In 1995, 18 of 22 resident applicants with Angela Rock's index score of 196 were admitted. Stip. Fact ¶ 61.

75.     Angela Rock was a presumptive admit candidate in 1995. Race was not a factor in decision-making with respect to presumptive admit candidates and her application was referred to the admissions committee for reasons unrelated to race, including her lack of significant life experiences, weak personal statement, less than strong recommendations and issues concerning specific grades. Rock was given a committee ranking of 10. There is no reason to believe that Angela Rock's committee ranking would have changed under an admissions system giving less weight to the racial or ethnic diversity of other applicants. Exhibit A-15 at 12. Race did not play a substantial role in Rock's denial of admission to the Law School.

H.     The Law School Admissions Process in 1996 - Plaintiff Pyle's Application

76.     Plaintiff Pyle applied for admission to the Law School in 1996. Pyle was a Washington resident.

77.     For the admissions process leading to the class that matriculated in the fall 1996, the Law School used a two-digit index on a scale of 00-99. The formula for creating the index in 1996 gave somewhat less weight to the LSAT score (approximately 55%) and somewhat greater weight to the undergraduate GPA (45%) than had the formula used in 1994 and 1995. The revised formula was $6.73 \times GPA + .4060 \times (LSAT)$. Stip. Fact ¶ 62.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW 21

1   78.   Plaintiff Pyle's index score using this two-digit index was 89. Stip. Fact ¶ 65.
2   In 1996, 28 of 64 resident applicants with an index score of 89 were admitted to the Law
3   School. Id.

4   79.   Defendants have identified the presumptive admit group in 1996 as consisting
5   of resident applicants with index scores of 91 or higher, and non-residents with index scores
6   of 92 or higher. 275 candidates were included in this group, made up of 242 whites, 27
7   Asians, 5 Hispanics and 1 Filipino. 23 candidates (including five Washington residents)
8   were referred to the admissions committee; 22 were white and one was Asian. The group
9   referred to the admissions committee from the presumptive admit group in 1996 received
10  committee scores of between 6-14, and 11 whites received offers of admission. Stip. Fact
11  ¶ 63.

12  80.   In 1996, Dean Madrid read all files below the presumptive admit cut-off. Of
13  the group of 1644 applicants in 1996 with index scores below the presumptive cut-off or with
14  no index score, Dean Madrid offered 112 admission without referral to the admissions
15  committee. This group included 8 Filipinos, 10 Native Americans, 15 African Americans, 41
16  whites (4 of whom had no index score), 16 Hispanics and 32 Asians (2 of whom had no
17  index score). Dean Madrid referred 290 applicants to the admissions committee. This group
18  included 3 Filipinos, 5 Native Americans, 4 African Americans, 240 whites, 16 Hispanics
19  and 22 Asians. Of this group referred to the admissions committee, 122 were offered
20  admission, including 1 Filipino, 1 Native American, 1 African American, 99 whites, 7
21  Hispanics and 13 Asians. The remaining 1242 candidates, including 16 Filipino, 17 Native
22  American, 27 African American, 919 white, 52 Hispanic, and 212 Asian, were denied by
23  Dean Madrid in 1996, without referral to the admissions committee. Stip Fact ¶ 64.

24  81.   In 1996, there were 64 preferential admits. There were more than 64 persons
25  referred to the admissions committee but denied admission. The Court finds that the 64
26  preferential admits would have been re-distributed amongst those who were referred to the

1  admissions committee. Pyle's application was denied without referral to the admissions

2  committee. If race had not been considered by the Law School, more probably than not, Pyle

3  would not have been admitted to the Law School.

4  I.      Expert Testimony and Analysis

5          82.     Plaintiffs argue that based on a statistical analysis by Doctor Stephen Klein, an

6  expert witness for plaintiffs, the evidence indicates that race was "more than a plus" as

7  permitted by Bakke. Plaintiffs argue that race was the determining factor in the admission of

8  minority candidates to the Law School in the years in question. Plaintiffs also contend that

9  defendants applied a significantly disparate standard to applicants of different races. See

10 Plaintiffs' Proposed Findings ¶ 99. The Court has carefully considered Doctor Klein's

11 testimony and report, Exhibit 97, and the report and testimony of defendants' expert, Doctor

12 Startz', Exhibits A-9 - A-12, and makes the following findings regarding the plaintiffs'

13 contentions, and the reports and testimony of these experts:

14         (a)     Neither expert made an analysis on a year-by-year basis. Doctor Klein

15 admitted no opinions could be reached on a year-by-year basis. Rather, both experts

16 considered the five year period 1994 - 1998 relevant in forming their opinions;

17         (b)     Because there were different scales of measurement for the years in question,

18 both experts converted all 5 years' statistics to a common scale of measurement. (Hereinafter

19 the "Converted Scale" resulting in a "Converted Score"). Klein Report, Exhibit 97; Startz's

20 report, Exhibit A-9. Smith had a Converted Score of 88. Rock's Converted Score was 90.

21 Pyle's Converted Score was 88. Exhibit A-24. Professor Klein estimates approximately 460

22 applicants (all years) received "preferential treatment" because race was considered as a

23 factor. Professor Startz estimates the number at 456. The Court finds the difference in these

24 estimates to be insignificant;

25         (c)     The Law School was much more likely to accept a minority applicant with a

26 given Converted Score than a white applicant with the same score;

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  23

(d)    Applying the percentage admission rates of white applicants to the pool of minority applicants at each Converted Score, it is predicted that the Law School would have offered admission to no more than 2 Filipino, 3 Native American, and 2 African American candidates each year if race had not been a factor in admissions;

(e)    While the Law School considered many diversity factors, the race/ethnicity factor was the most important diversity factor affecting admissions decisions in all years;

(f)    The amount of preference given to an applicant due to his or her race varied depending upon his or her race.  For example, Asian candidates were given less preference than African American candidates;

(g)    The experts are unable to explain why 802 whites having a rating of 90 or below on the Converted Scale (See Table 5 Klein report, Exhibit 97) were admitted to the Law School; both experts agree that diversity factors other than race were involved in the Law School's decision to admit applicants to the Law School.  Doctor Klein only analyzed 5 diversity factors in reaching his opinion, namely race, index score, fee waiver, residency and undergraduate major.  Yet both experts agree and the Court finds that other diversity factors played an important role in the Law School's admissions decisions in all years for all applicants;

(h)    White applicants at all levels were admitted with a Converted Score equal to or lower than minority applicants in each year.  Exhibit A-1;

(i)    There is no evidence that the persons admitted to the Law School in all years were not well-qualified applicants;

(j)    Neither expert was able to offer any opinion as to whether race played any significant part in the decisions of the admissions committee as to ranking and resulting admission or placement on a waiting list.  In general, the Court finds that applicants who were referred to the admissions committee for review (except the 136 whites in 1994 having an index score of 195-196 - See Findings of Fact 63-65) were more qualified than applicants

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  24

1  not referred to the committee. The Court finds that even the 136 white applicants with an

2  index score of 195-196 referred to the admissions committee in 1994 were more qualified

3  than plaintiff Smith;

4      (k)    Both experts agree the number of Native American applicants was too small a

5  sample to provide any meaningful analysis;

6      (l)    If only index scores were considered during the 5 years in question, and

7  minorities would have been admitted at the same levels as whites, most of the 460 minorities

8  who received offers might not have been considered for admission. Exhibit 97, Table 6.

9  However, many of these minority applicants had other diversity factors which would have

10  been considered important in making admission decisions in all years. Therefore, it is clear

11  that many applicants who received racial preferences would have been offered admission on

12  the basis of other diversity factors;

13      (m)    Whether an applicant received a fee waiver was not significant in the

14  admissions process;

15      (n)    Within each racial group, the index score was extremely important in decisions

16  to admit applicants to the Law School. In all years considered, 94.19% of all applicants in

17  the presumptive admit category were admitted. Exhibit A-9 at 5. Next to the index score,

18  race was the most significant factor in the admissions decisions;

19      (o)    The admission rates for the presumptive admit group by race in all years was

20  substantially the same as the admission rate for white applicants. Exhibit A-9 at 5 (all admits

21  94.19% as compared to 94.64% for whites); and

22      (p)    Neither expert was able to express an opinion as to whether any plaintiff would

23  have been admitted if race could be considered as a factor in admissions decisions by the

24  Law School.

25

26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  25

J.      Non-racial Diversity Factor

83.     In each year the Law School considered racial as well as non-racial factors in the admissions process. At all times material, in connection with considering all applicants in the discretionary group, the Law School gave significant weight to non-racial diversity and other non-objective characteristics in the admissions process, including unusual life experiences, foreign language skills, geography, post-college work, advanced degrees, disabilities, achievements in athletics, business or the military, public service, and numerous other factors. In evaluating the discretionary group, factors indicating academic potential greater than those shown by LSAT scores and contributions to diversity were identified and weighed. No attempt was made to define the weight that could be accorded to any diversity factor, and the weight sometimes changed as the pool was reviewed. For example, while the school believed that it was desirable to admit persons with a particular characteristic, it did not give as much weight to this characteristic if there were a significant number of qualified persons with a similar characteristic in the pool. Also, while the school's admissions policy speaks separately of factors indicating academic potential and contributions to diversity, in practice, reviewers did not attempt to weigh these factors separately.

84.     For example, a brief biography of 26 selected students for the 1994 entering class, as shown on Exhibit A-13, illustrates the non-racial diversity factors that these applicants presented for admissions. Similar diversity factors were also present in all years for applicants admitted to the Law School.

85.     The Court finds that race as well as non-racial diversity factors were considered by the Law School in making its admissions decisions in all years in question.

86.     Plaintiffs contend that Exhibit 104, a table prepared by plaintiffs to compare objective and diversity factors between applicants, is evidence that these various factors were not uniformly applied and amount to "pretext" for decisions which plaintiffs contend were made substantially based on race. Exhibit 104 is strong evidence that different members of

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  26

1   the Law School gave different weight to the same factors. For example, foreign language -
2   Chinese was only a "minor plus" for a white applicant in the opinion of Professor Kummert
3   as compared to a black applicant who received a "plus for fluency," by Dean Madrid in the
4   same language. Exhibit 104 at 3. Similarly, in considering overseas experience, Professor
5   Kummert gave no diversity consideration to an applicant who spent 2 years teaching English
6   in Taiwan; in contrast, Dean Madrid gave a diversity plus to a Filipino-American applicant
7   for a summer spent in the Netherlands and to a black applicant who said she had spent a "fair
8   amount of time abroad." Id. at 1-2. Professor Kummert testified at trial that he was
9   primarily focused on grades and index scores while Dean Madrid was more interested in
10  diversity factors. The Court finds that Exhibit 104 is not evidence of pretext, but of the fact
11  that both Professor Kummert and Dean Madrid applied their subjective judgment in
12  evaluating all of the strengths and weaknesses of the applicants to the Law School. The
13  Court finds that the various diversity factors other than race also played a substantial role in
14  these objective admission decisions in all years.

15      87.    In all years in question, the students who enrolled from the discretionary group
16  had similar numeric qualifications:

| Group | No. Enrolled | Mean GPA | Mean LSAT |
|-------|-------------|----------|-----------|
| White | 314 | 3.50 | 159.98 |
| Asian | 105 | 3.46 | 158.19 |
| Hispanic | 59 | 3.33 | 156.54 |
| Af. Amer. | 38 | 3.24 | 154.30 |
| Filipino | 29 | 3.34 | 156.28 |
| Nat. Amer. | 25 | 3.19 | 156.12 |

24  Exhibit A-9 at 8 (summary statistics for discretionary group - all years).

25

26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  27

K.      No Cut-Offs or Quotas or Intentional Discrimination

88.     There is no evidence that defendants intentionally established differential cut-offs, of any nature, or that they purposefully sought to exclude whites from consideration for seats that were offered to minorities. The number of relatively low scoring whites admitted establishes that there was no systematic exclusion of whites as a result of the "weight" given to race in the admissions process.

89.     During the admissions process the Law School did not keep track of how many minority applicants were being accepted. Similarly, the Law School did not keep track of applicants being accepted with graduate degrees, public service or other diversity factors. The only category that the Law School tracked during the process was Washington residency.

90.     The Court finds that defendants did not intentionally discriminate against any plaintiff in the admissions process.

91.     There is no evidence that defendants applied significantly disparate standards to applicants of different races.

92.     The treatment of Asian applicants demonstrates the Law School's lack of quotas. In 1990, approximately 5.1% of the resident population of Washington was Asian or Pacific Islander (including Filipino), yet the Law School admitted over 24% of the Asian applicants and over 34% of the Filipino applicants. See Exhibit 69 for statistical data. The Asian applicants were generally well qualified and were admitted at only a slightly higher rate than white applicants (21% applied versus 24% admitted) and at a lower rate than all other minority applicants, and constituted only 14% of the enrolled class. Exhibit A-9. Plaintiffs implicitly suggest that the number of applicants admitted within an ethnic group should be limited to a number proportionate to the percentage of the group within the resident population. To limit applicants of any race or ethnic background in this manner would be akin to establishing a quota or cut off and would not be permitted under Bakke.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  28

III.

Conclusions of Law

1.      Jurisdiction is vested in this Court under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Fourteenth Amendment to the United States Constitution and under federal laws, 42 U.S.C. §§ 1981, 1983, and 2000d, et seq.

2.      Venue in this Court is proper under 28 U.S.C. § 1391. This Court has personal jurisdiction over the defendants because the events giving rise to this action occurred in this district.

3.      Plaintiffs challenge the Law School's use of race as a factor in its admissions process. Because the Law School has used race in its decision making process, plaintiffs are "entitled to a judicial determination that the burden [they are] asked to bear on that basis is precisely tailored to serve a compelling governmental interest." Regents of the University of Cal. v. Bakke, 438 U.S. 265, 299 (1978). To survive constitutional review, the Law School's consideration of race must therefore (1) serve a compelling state interest and (2) be narrowly tailored to achieve that interest. Adarand v. Peña, 515 U.S. 200, 227 (1995).

4.      A diverse student body is a compelling state interest and therefore "a constitutionally permissible goal for an institution of higher education." Bakke, 438 U.S. at 311-12; Smith v. University of Washington, Law School, 233 F.3d 1188, 1201 (9th Cir. 2000). Educational diversity is a compelling state interest because we recognize that all citizens are benefitted when our nation's classrooms are filled with an atmosphere of "speculation, experiment, and creation" promoted by a diverse student body. Bakke, 438 U.S. at 312. By enriching a student's education with a variety of perspectives, experiences and ideas, a law school with a diverse student body helps equip its students to be a more productive member of society. Id. at 313. ("[I]t is not too much to say that the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of

1  students as diverse as this Nation of many peoples") (quoting <u>Keyishian v. Board of Regents</u>,
2  385 U.S. 589, 603 (1967)).

3       5.    "Ethnic diversity" can be "one element in a range of factors a university
4  properly may consider in attaining the goal of a heterogenous student body." <u>Bakke</u>, 438
5  U.S. at 314.  Race may be considered "a plus" as long as it does not insulate the individual
6  applicants from comparison to all other candidates for the available seats.  In other words,
7  race can be a factor in determining a particular applicant's "potential contribution to diversity
8  without the factor of race being decisive" when compared to the qualities exhibited by others.
9  <u>Smith</u>, 223 F.3d at 1197 (quoting <u>Bakke</u>, 438 U.S. at 317).

10       6.    The University of Washington Law School consciously considered race in
11  granting offers of admission to the school.  The purpose of the Law School's admission
12  policy was to improve the quality of legal education and experience of its students by
13  facilitating an open and vigorous exchange of ideas by students of diverse backgrounds.  This
14  has furthered the mutual understanding and respect of all students at the Law School during
15  the years in question.

16       7.    Consideration of race in evaluating applications for admissions was necessary
17  to achieve the goal of educational diversity at the Law School.  Failure to consider race
18  would have had the potential effect of denying many qualified minority applicants an offer of
19  admission to the Law School.

20       8.    The Law School also considered other diversity factors in its admissions
21  process including cultural background, activities or accomplishments, career goals, living
22  experiences, disabilities or other special talents that might contribute to the diversity of the
23  Law School community.

24       9.    The Law School's admission program was intended to resemble a "Harvard-
25  type" admissions program consistent with <u>Bakke</u>.  Such a program is described in <u>Bakke</u> as
26  follows:

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  30

> [A Harvard-type admissions] program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment.

438 U.S. at 318. Bakke establishes that the "Harvard-type" admissions program, appended to the opinion of Justice Powell, represents an admissions program that considers race in a manner consistent with constitutional requirements, and that an admission policy modeled after the "Harvard-type" program is sufficiently narrowly tailored to satisfy the strict scrutiny standard to which racial classifications are subject. Smith v. University of Washington Law School, 2 F.Supp.2d at 1334-35.

10.    The "Harvard-type" program sets out several guideposts for a court to use in determining whether a program is constitutionally permissible. An applicant's race or ethnicity cannot isolate him from comparison to other candidates, although it can be used as a plus in making that comparison. A law school must not use a quota system or set-aside seats which can only be filled by minority students. The admissions program must be sufficiently flexible to allow consideration of all elements of diversity and consider each applicant on an individual rather than racial class basis. Bakke, 438 U.S. at 317-19.

11.    The Law School did not use an explicit or de facto quota system in implementing its race-conscious admissions system. The Law School acted in good faith in attempting to implement an admissions process that would satisfy Bakke. This Court assumes that a university intending to implement a "Harvard-type" program is acting in good faith and is not attempting to hide an illegitimate quota system. Bakke, 438 U.S. at 319. The Law School did not track the number of offers extended to minority candidates while the admissions process was ongoing. It did not have a pre-set goal of the number of minority students it wished to enroll but waited until all applications had been reviewed and only then

FINDINGS OF FACT AND
CONCLUSIONS OF LAW 31

attempted to maximize the diversity of the student body without reference to numerical targets. Non-minority candidates were not systematically excluded from consideration for admission at any index level and were not excluded from consideration by the "plus" given to minority candidates at the same levels. Non-minority candidates not selected for an offer of admission were not "foreclosed from all consideration for [a] seat simply because [they were] not the right color or had the wrong surname." Bakke, 438 U.S. at 316. Race was the most important diversity factor and accorded the most weight in evaluating diversity characteristics of discretionary applications, but this did not create a de facto quota system. Because race and ethnicity are a "plus," they undoubtedly "tipped the balance" in some applicants' favor. Importantly, however, this consideration of race and ethnicity did not operate to insulate any prospective student from competition with other applicants. The Law School may give different weight to different factors because "the weight attributed to a particular quality may vary from year to year depending upon the 'mix' both of the student body and the applicants for the incoming class." Bakke, 438 U.S. at 318.

12.   At all times material, each applicant to the Law School was considered on his or her own merits and compared to other applicants. Minority applicants were not set aside for separate evaluation but considered in conjunction with other applicants under the same review process. The Law School did not have a "two-track" system for evaluating minority and non-minority applicants separately.

13.   At all times material, diversity factors other than race were of crucial importance in evaluating discretionary applicants and determining which students would be offered admission. Non-minority students were offered admission at every academic ranking level minority students were offered admission. The Law School considered diversity factors other than race in weighing applications. The Law School further narrowed its use of race by using the ethnicity substantiation letter to better determine which minority students would fulfill the goal of creating a pool of students with diverse backgrounds. The ethnicity

1  substantiation letter allowed the Law School to give preference to those minority students
2  whose race had impacted their views and experiences rather than giving preference to
3  students based on their race alone.  Thus, the program was designed to be sufficiently
4  flexible to give more weight to those minority candidates who had more to contribute to the
5  diversity of the classroom.

6      14.    Admissions programs designed to create educational diversity are unique in
7  that they implicate both the First and Fourteenth Amendments. While diversity is a
8  compelling state interest, consideration of race implicates applicants' Fourteenth Amendment
9  rights.  Conversely, "[a]cademic freedom, though not a specifically enumerated constitutional
10 right, long has been viewed as a special concern of the First Amendment." Bakke, 438 U.S.
11 at 312.  Therefore, a university has a right to great judicial deference in how it selects its
12 student body as this process falls within the "four essential freedoms" identified in Sweezy v.
13 New Hampshire, 354 U.S. 234, 263 (1957) ("[T]here prevail 'the four essential freedoms' of
14 a university - to determine for itself on academic grounds who may teach, what may be
15 taught, how it shall be taught, and who may be admitted to study.").

16     15.    As a result of the Law School's consideration of race and other diversity
17 factors, each applicant was treated as an individual "rather than as a mere stand-in for some
18 favorite group." Smith, 233 F.3d at 1197. Admissions decisions are inherently subjective
19 opinions about each applicant's academic potential.  When courts are asked to review the
20 substance of a genuinely academic decision, the Supreme Court has instructed judges to
21 show "great respect" for the faculty's professional judgment. Regents of the Univ. of Mich.
22 v. Ewing, 474 U.S. 214, 225 (1985).  That is because courts are not well-suited "to evaluate
23 the substance of the multitude of academic decisions that are made daily by faculty members
24 of public educational institutions...." Id. at 226.

25     16.    The Law School's admissions policy and the procedures followed in the years
26 in question are virtually indistinguishable from the "Harvard-type" plan approved in Bakke.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW  33

1   "As the logical result of reliance on the Harvard Plan, the unsuccessful applicants' statistical

2   evidence accordingly cannot sustain their contention that the Law School's admission policy

3   is unconstitutional." See Grutter v. Bollinger, 288 F.3d 732, 748 (6th Cir. 2002).

4       17.   The Court concludes that the University of Washington Law School's

5   admission program for the years of 1994, 1995, and 1996 was narrowly tailored to achieve

6   the compelling state interest of educational diversity and does not violate federal law.

7       18.   Defendants are entitled to have judgment entered in their favor on all claims.

8

9   DATED this 5th day of June, 2002.

10

11

12

                THOMAS S. ZILLY

13                 UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW 34